# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CARLTON A. BROWN, | ) |
|     Plaintiff, | ) No. 15 C 10160 |
| v. | ) Magistrate Judge Sidney I. Schenkier |
| NANCY A. BERRYHILL, Acting Commissioner of the U.S. Social Security Administration,[1] | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Carlton A. Brown ("plaintiff" or "Mr. Brown") has filed a motion for summary judgment seeking reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Income ("SSI") (doc. # 15: Pl.'s Mot. for Sum. J.). The Commissioner has filed her own motion seeking affirmance of the decision denying benefits (doc. # 26: Def.'s Mot. for Sum. J.). For the following reasons, Mr. Brown's motion for remand is granted and the Commissioner's motion is denied.

### I.

On October 15, 2012, Mr. Brown applied for SSI, claiming an onset date of October 1, 2010 (R. 130, 149). His application was denied initially on November 28, 2012 (R. 85), and upon reconsideration on May 24, 2013 (R. 109). On May 31, 2013, Mr. Brown filed a request for a hearing before an Administrative Law Judge ("ALJ") (R. 112).

---

[1] On January 23, 2017, Nancy A. Berryhill became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the Court has substituted Ms. Berryhill for Carolyn W. Colvin as the named defendant.

[2] On March 15, 2016, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 13).

The hearing before an ALJ was held on June 10, 2014 (R. 33). At the hearing, Mr. Brown's attorney amended the alleged onset date to July 24, 2013 (R. 36).³ Plaintiff, represented by counsel, a medical expert, and a vocational expert all testified at the hearing (R. 33). On June 30, 2014, the ALJ ruled that plaintiff was not disabled, and plaintiff appealed (R. 17, 28). The Appeals Counsel denied plaintiff's request for review on September 10, 2015, making the ALJ's determination the final opinion of the Commissioner (R. 1-4). *See* 20 C.F.R. § 404.981; *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

Mr. Brown contends that the ALJ's determination that he is not disabled should be reversed because the ALJ erroneously: (1) dismissed the opinion of plaintiff's treating psychiatrist; (2) analyzed whether plaintiff's mental impairments meet or equal a listing level; (3) made a negative credibility finding; and (4) accepted the VE's testimony regarding other available work (doc. # 16: Pl.'s Mem. In Supp. of Sum. J. at 4-5). The Court finds that the ALJ erred by inadequately supporting his decision to give little weight to the medical opinion of plaintiff's treating psychiatrist, Dr. Berman, as set forth in his Mental Residual Functional Capacity Statement ("Mental RFC") (R. 27). On that basis, we grant plaintiff's motion, without reaching the merits of plaintiff's other arguments. *See Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011) (ALJ's improper consideration of treating physicians' opinions is "enough to require us to remand ... [and] [w]e therefore needn't decide whether the reasons the ALJ gave in support of her adverse credibility finding ... were so 'patently wrong' as to separately require remand").

## II.

We now summarize the administrative record. As the Court bases its decision to remand on the ALJ's analysis of plaintiff's mental health issues, we will generally address only those

---

³Plaintiff's counsel explained that the onset date was amended from October 1, 2010 to July 24, 2013, because Mr. Brown stated that he has been clean from drugs since July 24, 2013 (R. 81).

2

parts of the record relevant to that issue. We set forth general background in Part A, followed by an abbreviated review of the medical record in Part B. In Part C, we discuss the hearing testimony and, in Part D, we address the ALJ's written opinion.

### A.

Mr. Brown was born on October 16, 1966 (R. 145). At the time of the hearing, he was forty-seven years old, weighed 200 pounds, and was 5' 9" tall (R. 40).[4] He is a high school graduate, and is single (R. 41, 203). Plaintiff previously worked as a janitor and as an assembly line factory worker (R. 173). At the time of the hearing in June 2014, plaintiff was homeless and had been living at a shelter for nine months (R. 41). He previously lived with his mother, but he moved into the shelter when she died (R. 48).

### B.

Mr. Brown originally filed for benefits alleging solely physical ailments, including bad knees (R. 149). Plaintiff received one consultative examination, an internal medicine consultation performed by Dante Pimentel, M.D., on March 28, 2013 (R. 202-208). After taking a history and performing an examination, Dr. Pimentel diagnosed Mr. Brown with internal derangement of his knees and right shoulder, gout, and a lipoma on the right scapula (R. 205). Dr. Pimentel opined that plaintiff's ability to lift, carry, and carry out work-related activities is mildly impaired due to his internal shoulder derangement (*Id.*).

On July 17, 2013, Mr. Brown checked into the emergency department at Advocate Trinity Hospital ("Trinity ER"). Plaintiff presented with suicidal ideation and depression, and stated that he was hearing voices telling him to hurt himself (R. 341). Plaintiff reported that the symptoms had been occurring for the past twelve weeks but were getting worse (*Id.*). The Trinity

---

[4] The ALJ noted that plaintiff's Body Mass Index or BMI is 29.8, below the threshold defined as obese in SSR 02-1p (R. 23).

ER transferred plaintiff to Chicago Lakeshore Hospital's psychiatric facility ("CLH Psychiatric") for a psychological evaluation (R. 341, 343). Mr. Brown received inpatient treatment at CLH Psychiatric under Dr. Paisner, and was discharged from the facility on July 22, 2013 (R. 509). At the time of discharge, plaintiff was prescribed aftercare treatment for depression; a discharge letter from CLH Psychiatric, dated June 22, 2013, stated that Mr. Brown "will be continuing treatment in an outpatient capacity" (R. 506, 509). A follow-up appointment was made to see Dr. Paisner on August 7, 2013 (R. 507); there is no evidence in the record indicating whether Mr. Brown attended that appointment.

On October 18, 2013, Mr. Brown was again hospitalized for six days at CLH Psychiatric due to severe depression, acute psychoses and suicidal ideations, and was discharged on October 23, 2013 (R. 222, 235). At discharge, plaintiff was prescribed medication and aftercare treatment for depression and psychosis (R. 222). As part of his discharge, an appointment was made for the next morning for follow-up treatment at Community Counseling Centers of Chicago ("Community Counseling") (*Id.*). At his intake appointment with Community Counseling on October 24, Mr. Brown exhibited the following symptoms: anger, anxiety, confusion/difficulty understanding, crying, current auditory and visual hallucinations, high energy, panic attacks and paranoia (R. 231). Plaintiff was listed as taking Xanax (a sedative used to treat anxiety and panic attacks) and Prozac (*Id.*).[5] Mr. Brown was diagnosed with mood disorder, psychotic disorder, cocaine and opioid abuse in partial remission, antisocial personality disorder, seizure disorder and hypertension; he was assigned a Global Assessment of Functioning ("GAF") score of 50 (*Id.*). The intake assessment further noted that Mr. Brown has a "serious impairment" in social and occupational functioning, and "significant impairment in an important area of life

---

[5] The record is unclear whether these were the medications prescribed on discharge from CLH Psychiatric the prior day.

4

functioning as a result of" his mental disorders (R. 233). Plaintiff was scheduled for a psychiatric evaluation with a psychiatrist, Valentin Berman, M.D. (R. 241).

Mr. Brown was first seen by Dr. Berman on November 26, 2013 (R. 245). At this appointment, plaintiff's affect was blunted, and Dr. Berman noted that plaintiff was experiencing auditory hallucinations and paranoid delusions (R. 250-251). Dr. Berman prescribed Mr. Brown Risperdal, an antipsychotic drug, 2 mg qhs[6] (R. 252). The record also contains physician's notes from Mr. Brown's subsequent appointments with Dr. Berman on December 17, 2013, and January 10, February 4, February 25, and March 18, 2014 (R. 253-298). At his December 17, 2013 appointment, Mr. Brown reported increased anxiety and an increase in hallucinations (R. 253). Dr. Berman opined that plaintiff's psychotic disorder problem was worsening and changed his prescription to Seroquel, a different type of antipsychotic drug, at a dosage of 200 mg qhs (R. 258-259). At Mr. Brown's later visits, Dr. Berman noted that plaintiff was doing better but still experienced hallucinations (R. 261, 269, 278, 285). At the January 10, 2014 appointment, Dr. Berman increased the Seroquel dosage to 400 mg qhs and, at the February 4 appointment, Dr. Berman increased the Seroquel dosage to 600 mg qhs (R. 267, 275).

Dr. Berman submitted a Mental RFC to the SSA, dated May 21, 2014, regarding plaintiff's functioning in the areas of social interaction, sustained understanding and memory, sustained concentration and memory, and adaption in a work setting (R. 518-521). In the Mental RFC, Dr. Berman diagnosed plaintiff with mood disorder, psychosis, and opioid and cocaine abuse in remission and assigned him assigned a GAF score of "65/75" (R. 518). In 20 different areas, Dr. Berman rated Mr. Brown's mental ability to "function independently, appropriately, effectively and on a sustained, consistent, useful and routine basis, without direct supervision or

---

[6] This is a medical prescription abbreviation meaning that the dosage is to be taken every night at bedtime. *See* http://www.everypatients advocate.com/columns/prescriptionabbreviations.pdf

5

undue interruptions or distractions – 8 hours per day, 5 days per week – in a regular, competitive work setting for more than six consecutive months" (R. 518-520). For each area, Dr. Berman assessed the extent to which plaintiff's mental disorders affected his performance in an eight-hour workday (*Id.*). Dr. Berman found four areas in which plaintiff's mental disorders did not preclude his performance at all, including his ability to carry out "very short and simple instructions;" three areas in which plaintiff's mental disorders precluded his performance for only five percent of the workday, including making "simple work-related decisions;" and six areas in which plaintiff's mental disorders precluded his performance for 10 percent of the workday, including "perform[ing] activities within a schedule, maintain[ing] regular attendance, and be[ing] punctual" (*Id.*).

Dr. Berman further found seven areas in which plaintiff's mental impairments affected his ability to perform workplace activities for 15 percent or more of an eight-hour workday, including: remembering locations and work-like procedures; maintaining attention and concentration for extended periods of time; sustaining an ordinary routine without special supervision; working in coordination without special supervision; working in coordination with or in proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes (*Id.*). Dr. Berman opined that the array of Mr. Brown's mental limitations would cause him to be "off task" for more than 30 percent of an eight-hour workday in a competitive work environment, and that he would on average be absent from work more than six days per month (R. 520).

## C.

At the administrative hearing, Mr. Brown testified that he lives in a shelter with twenty-three other men in one large room (R. 41-42). He generally likes to be by himself but there are two people at the shelter to whom he will talk (R. 42-43). On a typical day he will take a shower, watch the news, go for a walk to the park and then come back to the shelter and read a newspaper or magazines (R. 43).

Mr. Brown explained that about three months prior to the hearing, he worked for an organization picking up trash for five hours, once a week, for six weeks (R. 44). He stopped working because his knees started cramping up (R. 45). Plaintiff stated he cannot go back to work for that organization because the program was only for four months and it ended (R. 46). He has been looking for other jobs, mostly in factories (R. 47).

When asked by the ALJ why he isn't working, Mr. Brown answered because of his mental state; "certain days I just want to be alone" (R. 51). He further explained that if he is mad, he cannot get along with others and wants to be "secluded" (*Id.*). He experiences mood swings (*Id.*). He also gets paranoid that people are following him and are talking about him (R. 61). He experiences these feelings up to three times a week (*Id.*).

The medication plaintiff takes has helped stop his suicidal thoughts, and has helped reduce other symptoms (R. 63). Mr. Brown used to hear voices every other day, but he hears them less often (about once a week) while on the medication (*Id.*). He experiences good days and bad days (R. 64). On a bad day, plaintiff wakes up in the morning hearing voices (R. 65). This usually happens about once a week now that they changed his medication (R. 65).

The ALJ questioned a medical expert ("ME") who was board certified in internal medicine (R. 66). The ME testified as to Mr. Brown's physical medical conditions, but stated

7

that he was not trained in psychology and was not assessing any of plaintiff's psychological conditions (R. 70).

The ALJ then asked the vocational expert ("VE") whether an individual of the plaintiff's age, education and work history, with plaintiff's upper extremity limitations, could perform any of the plaintiff's past work. The VE responded that such an individual could perform the plaintiff's past work as a janitor as well as other jobs (R. 76-77). The ALJ also asked about whether that prior work could be performed by an individual with these limitations, but also who could have only occasional, brief, and superficial contact with coworkers, supervisors and the general public; could perform simple tasks with no fast production rate pace or strict quotas; could make simple, work-related decisions; and could tolerate simple and routine workplace changes (R. 78). The VE responded that while no past positions that plaintiff has held would be available for that individual, there are other jobs such an individual could perform: a laundry aide, mail sorter and housekeeper, for which between 2,000 and 252,000 total jobs exist nationwide (R. 78-79).

However, the VE testified that all of the jobs she identified would be ruled out if the individual were to be off task for 15 percent or more of the workday (R. 79-80). The VE further opined there would be no available work for an individual who would miss two or more days of work per month, as that would exceed the typical absenteeism allowed (R. 79). In making these determinations, the VE relied on her professional experience and the Dictionary of Occupational Titles ("DOT") (R. 79).

8

**D.**

In his June 30, 2014 opinion, the ALJ followed the familiar five-step process for determining disability, 20 C.F.R. § 404.1520(a)(4) and found that Mr. Brown was not under a disability, within the meaning of the Social Security Act (the "Act"), at any time since October 15, 2012, the date his application was filed, through the date of the decision (R. 21). The ALJ determined Mr. Brown has not engaged in substantial gainful activity since October 15, 2012 (R. 22). The ALJ found that Mr. Brown suffers from the following severe impairments: degenerative joint disease of the knees and shoulders, depression/mood disorder, psychotic disorder, and antisocial personality disorder (*Id.*). The ALJ next found that Mr. Brown's severe impairments, individually or in combination, do not meet or medically equal a listed impairment (R. 24).

Considering the entire record, the ALJ found that Mr. Brown has the residual functional capacity to perform light work except that he can: only occasionally climb ladders, ropes, scaffolds, ramps and stairs; only occasionally stoop, kneel, crouch, crawl and balance; occasionally reach over his shoulders bilaterally; maintain only occasional brief/superficial contact with supervisors, coworkers and the general public; perform simple tasks with no fast production rate, pace or strict quotas; make simple work related decisions; and handle simple routine workplace changes (R. 25-26). In making this determination, the ALJ found plaintiff's subjective allegations of functional limitations not entirely credible (R. 26). With respect to his mental impairments, the ALJ noted that plaintiff received no "regular" treatment or outpatient care until October 2013, and that improvement was shown with conventional medication and treatment (R. 26). The ALJ further opined that Mr. Brown's hospitalizations for depression were "acute and quickly resolved" (*Id.*).

Considering opinion evidence, the ALJ gave significant weight to the ME's opinion assessing plaintiff's physical impairments, finding the ME performed a comprehensive record review and is a specialist in occupational medicine (R. 27). By contrast, the ALJ gave little weight to Dr. Berman's opinion on Mr. Brown's psychiatric impairments (R. 27). The ALJ stated "the opinion of Dr. Berman is not an actual medical source statement" (R. 27). While acknowledging Dr. Berman is a treating specialist, the ALJ found that Dr. Berman's findings and opinions about plaintiff's levels of functional limitation were "extreme," and inconsistent with: the treatment notes, particularly those reflecting improvement in the several months prior to submission and dating of the doctor's assessment; the GAF scores Dr. Berman assigned to Mr. Brown; and Mr. Brown's testimony (*Id.*). The ALJ opined that Dr. Berman's finding that plaintiff would be off task more than 30 percent of the time and miss more than six days per month was inconsistent with the functional limitations reasonably supported by the record and testimony (*Id.*).

### III.

The Act, 42 U.S.C. § 405(g), requires us to uphold the findings of the Commissioner if they are supported by substantial evidence. *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016). Therefore, we will reverse the Commissioner's findings only if they are not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In doing so, we may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). Instead, we must look to whether the ALJ built an "accurate and logical bridge" from the evidence to his conclusion that the plaintiff is not disabled. *Curvin v. Colvin*, 778 F.3d 645, 648

(7th Cir. 2015). An ALJ need not discuss every individual piece of evidence as long as he adequately justifies his conclusions. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013).

"To qualify for gainful employment one must be able to work on a 'sustained basis,' defined as eight hours a day five days a week, ... and to be incapable of gainful employment is to be totally disabled within the meaning of the Social Security Act." *Voigt v. Colvin*, 781 F.3d 871, 873 (7th Cir. 2015) (*citations omitted*). "To miss four workdays a month would reduce one's average workweek from five to four days, which would not constitute working on a sustained basis as defined by the Commission." *Voigt*, 781 F.3d at 873. The weight accorded Dr. Berman's opinions that Mr. Brown will be "off task" for more than 30 percent of an eight-hour workday, and will on average miss more than six days per month due to his mental impairments, is thus critical to determining whether plaintiff is disabled.

It is undisputed that Dr. Berman was plaintiff's treating physician. It is well-settled that "an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) it is not *inconsistent* with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (*emphasis added and citations omitted*); *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (*emphasis added and citations omitted*) (treating psychiatrist's opinion was entitled to controlling weight if it was "'well-supported and not *inconsistent* with other substantial evidence'"); 20 C.F.R. § 404.1527(c)(2). If the ALJ does not give a treating physician's opinion controlling weight, he is "required to provide a sound explanation" for rejecting it. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

When an ALJ decides to give a treating physician's opinions less than controlling weight, he "must offer 'good reasons' for doing so, after having considered: (1) whether the physician

examined the claimant, (2) whether the physician treated the claimant, and if so, the duration of overall treatment and the thoroughness and frequency of examinations, (3) whether other medical evidence supports the physician's opinion, (4) whether the physician's opinion is consistent with the record, and (5) whether the opinion relates to the physician's specialty." *Brown v. Colvin*, 845 F.3d 247, 2523 (7th Cir. 2016). If the ALJ decides not to give controlling weight to a treater's opinion, he must use these factors to minimally articulate sound reasons for that decision; the ALJ also must explain what weight (if any) he gives to the opinion. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) ("[e]ven if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, [he] has to decide what weight to give that opinion," considering "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and support for the physician's opinion"); *see also* 20 C.F.R. § 404.1527(c). For the following reasons, we find that the ALJ failed to build an accurate and logical bridge between evidence in the record and his decision that Dr. Berman's opinion is entitled to little weight.

*First*, the ALJ begins his analysis by stating, without explanation, that Dr. Berman's opinion "is not an actual medical source statement" (R. 27). The Commissioner argues that plaintiff's criticism of this remark "is merely a red herring" (Def.'s Mem. In Supp. of Sum. J. at 6), because the ALJ immediately thereafter recognized Dr. Berman as a treating specialist who issued an opinion that the ALJ was required to weigh and consider (R. 27). The Commissioner states that the phrase "medical source statement" is both a term of art under the Social Security regulations and an SSA form that ALJs are directed to use when requesting a medical opinion, and thus the "'commonsensical' reading of the [ALJ's] decision is simply that Dr. Berman did not use SSA's standard form" (Def.'s Mem. In Supp. of Sum. J. at 6).

12

However, even if we accept that the Commissioner's post-hoc explanation (which the ALJ did not offer) is what the ALJ actually meant, it remains unclear whether the ALJ devalued the opinions merely because they did not appear on the standard SSA form. If he did so, that presents a problem. While Dr. Berman's Mental RFC findings are on a worksheet type form, worksheet observations are medical opinion evidence that the ALJ must consider. *See Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015).

Further, if the ALJ was unclear about certain of Dr. Berman's opinions because they were not on the SSA's standard form, it was the ALJ's duty to contact Dr. Berman for clarification. *See Ynocencio v. Barnhart*, 300 F.Supp.2d 646, 657 (N.D. Ill. 2004) ("If the evidence received from a treating physician or other medical source is inadequate to make a determination of disability, those sources must be re-contacted to obtain any readily available additional information."), *see also* SSR 96-5p, at *6 (stating if "the adjudicator cannot ascertain the basis of the [treating source's] opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion"). It is the ALJ's duty to develop a full and fair record, and "[f]ailure to fulfill this obligation is 'good cause' to remand for gathering of additional evidence." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).

*Second*, the ALJ stated that Dr. Berman's "extreme findings and levels of functional limitation are inconsistent with the treatment notes, particularly those reflecting improvement in the several months prior to submission and dating" of the assessment (R. 27). Based on a review of Dr. Berman's treatment notes, the Court finds the ALJ neglected to set forth documented symptoms and medication adjustments during this period of time and impermissibly "cherry-picked" from the record in order to support his conclusion. *See Scott v.* Astrue, 647 F.3d 734, 739-740 (7th Cir. 2011) ("The ALJ was not permitted to 'cherry-pick' from … mixed results to

13

support a denial of benefits"). While the ALJ noted that in his January, February and March 2017 visits Mr. Brown was doing better, the ALJ failed to note that Dr. Berman increased Mr. Brown's daily medication from 200 mg of Seroquel to 400 mg and then to 600 mg during that period (R. 261, 269, 272-273, 275, 278, 280-281, 285, 288-289). Further, at each visit, Dr. Berman noted that plaintiff continued to suffer from auditory hallucinations and paranoid delusions, his affect was blunted, and he was irritable (*Id.*).

In *Scott*, the Seventh Circuit criticized the ALJ for being "too quick to read inconsistency" when she relied solely on a treater's note that the claimant was responding well to treatment when the doctor also opined that the claimant was markedly limited in the ability to work and likely to miss three days of work per month. *Scott v.* Astrue, 647 F.3d 734, 739-740 (7th Cir. 2011). As noted by the *Scott* court, "[t]here can be a great distance between a patient who responds to treatment and one who is able to enter the workforce." *Id.*

*Third*, the ALJ stated that Dr. Berman's opinion was inconsistent with claimant's testimony, but failed to cite to what statements made by Mr. Brown during the hearing he found to be inconsistent with Dr. Berman's findings. An ALJ must explain the inconsistencies with enough detail to allow the reviewing court to understand the link between the evidence and the ALJ's decision. *See Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015) (reversing and remanding to ALJ to reevaluate whether treating physician's opinion entitled to controlling weight where ALJ did not "adequately articulate" how evidence was inconsistent); *Czarnecki v. Colvin*, 595 F. App'x. 635, 644 (7th Cir. 2015) (ALJ erred in giving "little weight" to treating physician by failing to identify specific inconsistencies in medical record evidence contradicting treating physician's assessment). In this instance, the ALJ's conclusory statement of "inconsistency" failed to meet that standard.

Moreover, even if Dr. Berman's opinions were not fully corroborated by his treatment records, the ALJ failed to cite evidence that *contradicted* the opinions. As recently explained by the Seventh Circuit "[t]his distinction is an important one, since the mere absence of detailed treatment notes, without more, is 'insufficient grounds for disbelieving the evidence of a qualified professional.'" *Brown*, 845 F.3d at 253 (*citations omitted*). In the instant case, there are no other medical opinions in the record addressing Mr. Brown's mental impairments, or evidence concerning limitations due to those impairments. The SSA did not order a consultative mental examination or solicit the testimony of an ME at the hearing to assess plaintiff's mental impairments. "In effect, the ALJ substituted his own judgment for [Dr. Berman's] without explaining *why* [Mr.] Brown's [testimony was] inconsistent with [Dr. Berman's] opinions." *Id.* (*emphasis in original*).

*Fourth*, it is well settled that an "ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so;" nor can he "disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion." *Murphy ex rel. Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). Here, the ALJ inappropriately "played doctor" after discounting Dr. Berman's opinion. More specifically, after dismissing Dr. Berman's assessment as inconsistent with the underlying treatment notes, and without an opinion from another medical expert, the ALJ erred by then offering his own medical opinion that the treatment records "do demonstrate a mild to moderate inability to understand, remember and carry out more than short and simple instructions or maintain attention and concentration for extended periods of time" (R. 25). The rejection of Dr. Brown's opinion left an "evidentiary deficit" that the ALJ was not entitled to fill with his own lay opinion. *See Suide v. Astrue*, 371 F.App'x. 684, 689-690 (7th Cir. 2010). While the ALJ found Mr. Brown's severe impairments include depression/mood disorder,

psychotic disorder and antisocial personality disorder (R. 22), there are no other medical records or opinions on the severity of Mr. Brown's mental impairments, or the limitations due to those impairments, other than what is found in Dr. Berman's records and those record from the two hospitalizations within an three-month period that immediately preceded plaintiff's treatment with Dr. Berman. The ALJ failed to support his conclusion with any medical source of record, and thus his lay conclusion lacks support. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

*Fifth*, the ALJ's reliance on GAF scores assigned in 2014 to find an inconsistency with Dr. Brown's functional limitations opinions raises questions. "The GAF score is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level." *Yurt v. Colvin*, 758 F.3d 850, n.2 (7th Cir. 2014) *citing Am. Psychiatric Ass'n, Diagnostics and Statistical Manual of Mental Disorders* ("DSM") 32 (4th ed. text revision 2000). In the Fifth Edition of the DSM, published in 2013, the American Psychiatric Association ("APA") "abandoned the GAF scale because of 'its conceptual lack of clarity ... and questionable psychometrics in routine practice.'" *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) *quoting* DSM 16 (5th ed. 2013). While the Seventh Circuit has noted that the APA "no longer uses this metric," it has not criticized use of these scores in cases where the psychiatric evaluation was performed or the ALJ issued his decision prior to the APA abandoning the use of the GAF scale. *See Voigt v. Colvin*, 781 F.3d 871, 874-875 (7th Cir. 2015) (while noting APA has since eliminated GAF scale "as being unreliable," court considered GAF scores because APA's elimination occurred after the ALJ issued his decision in January 2012); *O'Connor-Spinner v. Colvin*, 832 F.3d 690, n.1 (7th Cir. 2016) (considering claimant's 2002-2003 GAF scores, in a footnote court explained while the APA no longer uses the GAF metric "the GAF was still in use at the time of the psychiatric

16

evaluations recounted in this record"). However, in this case, the ALJ in June 2014 used a GAF score issued in May 2014, both of which are dates after the APA abandoned use of the GAF score.

Finally, the ALJ failed to address the factors that must be considered under Section 404.1527(c) in determining the proper weight conferred to Dr. Berman's opinions. Dr. Berman treated plaintiff six times during a five month span, the doctor's appointments were every three or four weeks, and Dr. Berman's findings remained relatively consistent throughout the course of plaintiff's treatments. *See Campbell*, 627 F.3d at 308 (ALJ erred by failing to consider relevant factors that "may have caused the ALJ to accord greater weight" to doctor's opinion where doctor was a psychiatrist, treated the claimant on a monthly basis for fifteen months, and the doctor's findings remained relatively consistent throughout the course of the claimant's treatment). There is nothing in the ALJ's opinion to show that he considered these factors or gave them any weight.

## CONCLUSION

For the foregoing reasons, Mr. Brown's motion for summary judgment (doc. # 15) is granted and the Commissioner's motion for summary judgment (doc. # 26) is denied. The case is terminated.

**ENTER:**

_____
SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**DATE: March 14, 2017**